### JOE WARE v. STATE.

No. 2135. Decided January 15, 1913.

**1.—Murder—Charge of Court—Provoking Difficulty.**

Where, upon trial of murder, the court's charge on provoking the difficulty did not inform the jury that the defendant must do some act or say something that was calculated to provoke the difficulty, the same was insufficient; besides, the court should have submitted the issue that the deceased provoked the difficulty.

**2.—Same—Abandonment of Difficulty.**

Where, upon trial of murder, the court submitted the issue of provoking the difficulty and there was evidence of defendant's abandonment of the difficulty, this issue should have been submitted in a proper charge.

**3.—Same—Threats—Self-defense.**

Where, upon trial of murder, the court in his charge confused the law of self-defense with the law of threats and did not submit these issues in a separate charge, the same was reversible error.

**4.—Same—Charge of Court—Manslaughter—Adequate Cause.**

Wherever the adequate cause is statutory, ·the jury are not the judges as to whether there is a sufficient provocation or not, and where the court's charge on manslaughter blended the statutory adequate cause with the other facts, and made the jury the judges as to whether or not there was a sufficient provocation, the same was reversible error.

**5.—Same—Bill of Exceptions—Practice on Appeal.**

Where the bill of exceptions with reference to the introduction of testimony was filed too late, the same cannot be considered on appeal.

Appeal from the Criminal District Court of Dallas No. 2. Trial below before the Hon. Barry Miller.

Appeal from a conviction of murder in the second degree; penalty, eight years imprisonment in the penitentiary.

The opinion states the case.

*Jed C. Adams* and *J. C. Muse,* for appellant.—On question of the court's charge on self-defense and threats: Swain v. State, 86 S. W. Rep., 335.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of filing bill of exceptions: Roberts v. State, 62 Texas Crim. Rep., 7.

DAVIDSON, PRESIDING JUDGE.—Appellant was allotted eight years in the penitentiary for murder in the second degree. This is the second appeal,—the first being found in the 49 Texas Crim. Rep., 413. The statement of the case found in the report in the 49 Texas Crim. Rep., insofar as the State's side of the case is concerned, is as strongly put as the evidence would justify.

The defendant introduced evidence controverting that introduced by the State. A brief summary of the evidence for the defendant is substantially as follows: He says the first time he had heard of any ill-feeling on the part of deceased towards him was in April about a month preceding the killing when, in a conversation with Mr. Scott, Scott asked him what the trouble between himself and deceased was. Appellant told him that if there was any he did not know it. Scott said, "I allowed from what he said down there at the store the other day that you and him were at outs." Witness further testified that he informed Scott that there had never been any ill-feelings that he knew of and asked him what he heard deceased say. He said that deceased and John Cannada (who was also a witness in this case) were there in the store and he heard deceased tell Cannada that "he would put a head on me" (meaning appellant), and Cannada said "Don't get on him unless I am around," and he says, "I will keep the dogs off and you knock him down and stamp his God damned guts out;" that he told Scott that he could not see why deceased should make such a remark as that about him; that he had never done him any harm in his life of which he was aware. About two weeks before the difficulty, the deceased had shot appellant's dog; shortly after this, another witness Sparks informed appellant of other threats that deceased had made to this effect: "Yes, I shot the dog, and if he fools with me I will shoot him, too." Appellant again deprecated the matter and said he knew of no reason for the

ill-feeling; that he had never done any harm to the deceased of which he was aware. Another matter entered into the trouble to some extent. A short time previous to the difficulty a calf belonging to appellant had strayed off into the pasture, wheat field, or oat patch of the deceased. Deceased had complained to appellant's wife about it and talked ugly to her. Of this she informed her husband. On the morning of the difficulty the calf, it seems, had strayed into the field of the deceased again and appellant had sent to get it out. When appellant had gone to the post office to get his mail he found the deceased there. Appellant's wife made about this report of this matter between herself and the deceased: His wife went down in the pasture, on Thursday before the trouble, to get the calf and as she was driving it out she met the deceased, and he told her he wanted appellant to keep the calf away from there; if he didn't he would kill the durn thing; that is what she said he said, and she told him that we didn't know that the calf was troubling him but would keep it out, "and he says 'You tell him to keep that calf away from here, and if he don't like it I will kill it and kill him too.' " She got away as quick as she could and brought it home. Appellant came home to dinner the day of this occurrence and his wife gave him this information. His wife was very much worried about it. Appellant put a yoke on the calf but it seems this was not effective. On meeting at the post office, appellant narrates the occurrence about as follows: "As I walked in the post office they all turned around facing me, and I said, 'Good evening, gentlemen,' or 'Howdy do,' and Mr. Williams was standing at the delivery window, and to the right of the delivery window there was a door, and I walked to the door and I saw that Mr. Todd was looking through the 'W' box, and I said to him while he was looking through the 'W' box to give me my mail please, and about that time Mr. Williams turned to me and he says, 'Mr. Ware, have you got that calf of yours up yet?' and I says 'No, I told the children when I left home to get it up,' and he said he wanted me to get it up and wanted me to keep it up,' and I told him all right, and I says, 'I didn't know it was troubling you, I will get it up and keep it up,' and he says, 'I don't want to have to tell you about it any more,' and I says, 'It is not necessary to tell me any more, and if you do I will get it out of your way if I have to tie it to a tree,' and he pointed his finger and he says, 'I want you to keep that calf away from there, and I don't want to see it on my premises again,' and I says, 'All right, I will get the calf away, we won't have any trouble about it,' and he says, 'Well, I mean what I say, and I want you to keep that calf away from there,' and I says, 'All right, sir, you need not get on your ear about it,' and he says, 'Well, we are in the post office,' and I says, 'Well, that is all right, when I get my mail I am going to leave the post office,' and I waited there probably two minutes before Mr. Todd got through going through the mail, and gave me my mail and I took it and walked out; when I had got about

ten feet from the door, Mr. Williams had come out to the steps and he says, 'Hold on there,' and I stopped.'' Deceased came out and said, ''I want you to keep that calf off of my premises.'' Appellant told him all right; that it would not bother him if he had to put a rope around its neck and tie it to a tree. Deceased said, ''Well, you have been letting it run over me;'' appellant said, ''I didn't know it was troubling you;'' deceased said, ''Well, you knew it was coming there,'' and ''You keep it away from there now,'' appellant said, ''Tinsley, I don't want any trouble with you,'' ''I will keep the calf away from you,'' and deceased said, ''You have got it to do,'' and appellant said, ''I am going to do it.'' Deceased said, ''I don't want to have to tell you about it any more,'' and appellant replied it wasn't necessary to tell him any more. Deceased then remarked, ''If you don't keep that calf away from there, there is going to be trouble;'' appellant replied, ''Now, Tinsley, I don't want any trouble with you,'' and ''You have done everything you could to try to get a row out of me;'' and further, ''You have shot my dog, and you have done everything you could.'' Deceased said, ''Your dog was up there sucking my eggs,'' and appellant said, ''That dog never sucked an egg in his life,'' and deceased replied, ''I can prove it,'' and appellant said, ''You would prove a damned lie,'' Deceased then struck appellant and followed it up by beating him over and about the head. Appellant says he was in a dazed condition and thought deceased was going to kill him; that he had no way of stopping him except to shoot and he did shoot, firing one shot. The deceased struck him no more and appellant did not shoot again. He says his purpose in shooting was to stop him and as soon as he stopped, he quit shooting. Appellant further testified that when deceased struck him he hurt him, dazing him and gave him a pain; that he did not know what Williams had in his hand and could not look at him to see what he had; that he was busy trying to dodge the blows. This is a sufficient statement of the evidence in connection with that found in the report of the case on the former appeal.

Appellant contends that the court was in error in charging upon the issue of provoking the difficulty and that if he is in error upon this proposition that the court's charge was erroneous in not submitting the issue in proper form in the charge. The writer does not believe the issue of provoking the difficulty was in the case, but as the former appeal intimates that perhaps it was, that question will not be reviewed. It is contended, however, that the court's charge on this issue was erroneous in several respects. First, it did not inform the jury that the defendant must do some act or say something that was calculated to provoke the difficulty and for the purpose of provoking the difficulty. This criticism of the charge, we think, is correct. Another issue is presented on this phase of the case. The court, having charged the issue of provoking the difficulty as a limitation upon the right of self-defense, appellant contends that inasmuch as his testi-

mony shows that the deceased and not himself provoked the difficulty,—if the issue was in the case,— that the court should have submitted that phase of the law to the jury. In this we think appellant's contention is correct. Appellant, under his theory did not provoke the difficulty and makes the issue sharp, putting the deceased the aggressor from the beginning, both in words and in making the assault and in inflicting blows. The jury should in view of the charge given have in some way been informed that if the deceased provoked the difficulty and followed it up it would not be a limitation upon defendant's right of self-defense. This was not done and appellant's contention in this respect is well taken.

Another issue is presented in this connection. Having charged upon provoking the difficulty, it is contended that it was error not to submit the issue of abandonment of the difficulty. Appellant's testimony is included in the opinion as above set forth as bearing upon the question of abandonment. If the State's theory of provoking the difficulty was proper on the theory the evidence raised that issue, appellant's testimony as clearly raises the issue that he abandoned the difficulty and went away, but was stopped by deceased after he had emerged from and left the house. The jury should have been appropriately instructed to the effect that if they might believe that defendant provoked the difficulty, yet if he abandoned it, his right of self-defense would revive and his case would be entitled to consideration independent of what occurred in the first difficulty, so far as the right of self-defense was concerned. In this connection the writer would say that he does not believe the issue of provoking the difficulty was in the case. It was just a case where there was a quarrel which finally brought about the trouble, the deceased first bringing it on in the post office and a war of words ensued and appellant abandoned the difficulty, and deceased halting him and renewing the difficulty. There is a difference between bringing on a difficulty and provoking a difficulty for the purpose of getting some advantage, but what has been said above in regard to these matters is said in the light of the former opinion. If provoking the difficulty should be charged on in another trial, then the other two issues should also be given in charge,—first, that appellant abandoned the difficulty; second, that if deceased provoked or brought on the difficulty, it would not in any way compromise or abridge appellant's right of self-defense.

The court gave the law in regard to threats. This is criticized by appellant on several grounds. After giving the usual charge in this respect, the court uses this language: "If, however, you should believe from the evidence, beyond a reasonable doubt, that the defendant, with a pistol, fired upon and killed Tinsley Williams not for the purpose of protecting himself from unlawful violence from the said Tinsley Williams, and not because of reasonable apprehension at the time that the said Tinsley Williams was using or about to use un-

lawful violence upon him, or to carry into execution threats formerly made by the said Tinsley Williams, then he cannot justify the killing of the said Tinsley Williams, if he did kill him, as done in his own lawful self-defense." This portion of the charge should not have been given. There are quite a number of exceptions to this phase of the charge which we deem unnecessary to recapitulate. This was an unnecessary limitation on the right of self-defense and on the law of threats. If deceased threatened the life of appellant and was undertaking to execute that threat by doing him serious bodily injury, appellant had the right to act in self-defense. If the deceased had made an attack upon appellant, which threatened him with death or serious bodily injury he had a right to slay. It is not necessary under the law of threats that the deceased has actually made an attack. It is only necessary that he does something that indicates his purpose to execute the threats. While it may not have been absolutely necessary for him to charge on threats from the standpoint of actual danger, yet, having given a charge, as he did, it was misleading, and a curtailment as well as an abridgment of the law of threats. An independent charge submitting the law of threats should be given, when called for, unincumbered by the law of self-defense from an attack. In other words, where the law of self-defense is in the case from the standpoint of threats as well as from the standpoint of an attack upon the accused, the two isues must be charged upon separately and not by confusing the two. That is, if the court gives those charges they must be kept separate and distinct and not intermingled. The law of threats should not be confused with the law of self-defense from an attack made upon the person of the accused.

The charge on manslaughter is criticized. The court gave the stereotyped definition of manslaughter and among other things, made the statement that an assault causing pain or bloodshed would be adequate cause, but in applying the law to the facts the court gave this charge: "Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any), to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances," etc. Various objections are urged. It will be noticed that the court in submitting this law to the jury informed them that if the facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law. The trouble with this charge is this: It blends the statutory adequate

cause with the other facts and makes the jury the judges as to whether or not there was a sufficient provocation. Wherever the adequate cause is statutory the jury are not the judges as to whether there is a sufficient provocation or not. The jury are judges as to whether there was produced in the mind of the slayer such a condition of mind as rendered it incapable of cool reflection, but not of the statutory grounds of adequate cause. Where the statute specifies the "cause," the jury are not the judges of the sufficiency of the provocation, and the court is not justified, nor authorized to submit the sufficiency of the provocation, under those circumstances, to the jury. If there are other facts and circumstances in the case which would justify the mental status at the time of the difficulty, occurring before the time of the trouble, the present provocation can be viewed in the light of those other facts and circumstances, but the court in no case would be justified in submitting to the jury the sufficiency of the provocation where the statute enumerates that provocation or adequate cause.

There are some other question suggested in regard to the introduction of testimony, but inasmuch as the bill was filed too late for consideration, those matters are not discussed.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*